**ZIP DEE, INC., Plaintiff,**

v.

**DOMETIC CORPORATION, Defendant.**

**No. 93 C 3200.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 9, 1996.

**604**

Harry M. Levy, James J. Hill, Emrich & Dithmar; George McAndrews, Stephen F. Sherry, and Patrick J. Arnold, McAndrews, Held & Malloy, P.C., Chicago, IL, for Plaintiff.

William G. McGuinness, David C. Radulescu, Fried, Frank, Harris, Shriver & Jacobson, New York City; and Peter V. Baugher, Kenneth E. Kraus, Schopf & Weiss, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This long and contentious litigation between Zip Dee, Inc. ("Zip Dee") and The Dometic Corporation ("Dometic") has continued to pose so many and varied issues as to assume almost mythic proportions. Unfortunately the myth most often called to mind, as this Court has been called upon to resolve the parties' numerous disputes, has been the fifth of the Labors of Hercules—the cleansing of the Augean Stables. Or perhaps, given the manner in which the same or closely related tasks seem to reappear frequently in somewhat altered guises, the somewhat more elegant reference should be to the punishment visited on Sisyphus.

Let's stay with the latter. This time the boulder that this Court must push up a mountain of legal concepts is Dometic's motion under Fed.R.Civ.P. ("Rule") 56 for partial summary judgment on Zip Dee's trademark infringement claims. This District Court's General Rule ("GR") 12(M) and 12(N)[1] as well as the Rule 56 requirements have been complied with by both parties, so that the motion is fully briefed and ready for decision. For the reasons set forth in this memorandum opinion and order, this latest motion by Dometic is denied.

---

**1.** To facilitate the identification of any factual disputes, or to demonstrate the absence of any such disputes, this District Court has adopted those portions of GR 12, which require the parties to set out their respective factual positions together with references to the record.

*Summary Judgment Principles*

Under familiar Rule 56 principles Dometic has the burden of establishing both the lack of a genuine issue of material fact and that it is entitled to a judgment as a matter of law (*Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate only if the record reveals that no reasonable jury could find for Zip Dee on its trademark infringement claims. For purposes of this motion the evidence must be "construed as favorably to [Zip Dee] as reason and the record permit" (*Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 272 (7th Cir.1996)). So inferences will be taken in the light most favorable to nonmovant Zip Dee, but this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

*Facts*

Because the lawsuit's extensive background has been set out in earlier opinions (see 900 F.Supp. 1004, 1006–08 (N.D.Ill.1995) and 886 F.Supp. 1427, 1429–30 (N.D.Ill. 1995)), a bare review of the facts will suffice for present purposes. Nearly 30 years have passed since, back in 1967, Zip Dee obtained Patent 3,324,869 (the "'869 Patent") for a roll-up recreational vehicle ("RV") awning made of fabric but utilizing a flexible metal cover to protect it from deterioration while in storage.[2] Initially Zip Dee used a single sheet of flexible metal for the cover, but in 1969 it began to use an awning cover made of a series of metal slats. It is undisputed that the '869 Patent was broad enough to embrace the slatted metal cover design as well as a cover consisting of a single sheet of metal.

Sometime after the '869 Patent expired in 1984, Dometic's predecessor A & E Systems, Inc. ("A & E") began to produce similar awnings complete with the bright and shiny mirror-like finish of the awning covers manufactured by Zip Dee. In 1986 Zip Dee sued A & E in a California District Court, claiming that A & E had both violated the '869 Patent and engaged in common law unfair competition by infringing on Zip Dee's trade dress. Two years later a jury found in Zip Dee's favor on both claims, and the court entered judgment on the verdict and enjoined A & E from further violating Zip Dee's trade dress.[3]

Dometic acquired A & E in 1988 and, viewing the injunction as applicable only to RV awnings with a slatted metal cover that had a mirror-like finish, began to turn out awnings with slatted metal covers having a dull (matte) finish. Zip Dee had a different understanding: It contended that the injunction covered the overall form and shape of the awnings irrespective of the type of finish, so it instituted a contempt proceeding against Dometic. Zip Dee's take on the scope of the injunction was rejected by the California District Court, which ruled that the injunction related to the totality of Zip Dee's trade dress, expressly including the mirror-like finish.[4]

Zip Dee then tried a different tack. In 1990 it filed an application with the United States Patent and Trademark Office ("Trademark Office" or simply "Office") for a trademark for the "overall configuration of a slatted cover for an awning on a recreation vehicle." Although the Office initially rejected the application, Zip Dee was eventually able to convince the Office that the product configuration was entitled to federal registration. On December 15, 1992 the Office registered Zip Dee's trademark on the slatted awning configuration.[5]

2. One end of the metal cover attaches to the RV and the other to the first several inches of the fabric. When the fabric is rolled up from the opposite end the outer part of the roll is covered by the metal, thus shielding the fabric awning from the elements.

3. That decision was affirmed on appeal in an unpublished decision, reported in table as *Zip Dee, Inc. v. A & E Sys., Inc.,* 891 F.2d 298 (Fed.Cir.1989).

4. That holding was also affirmed on appeal in an unpublished decision, reported in table as *Zip Dee, Inc. v. A & E Sys., Inc.,* 935 F.2d 280 (Fed.Cir.1991).

5. Dometic also asserts in its Twelfth Affirmative Defense that Zip Dee engaged in inequitable conduct before the Trademark Office while registering the mark. If successful that defense would strip away the federal registration, but it would not be dispositive here because Zip Dee could

Zip Dee then brought this suit in May 1993, advancing both patent and trademark claims. After three years of pitched battles at every turn, generating no fewer than 11 written opinions by this Court, the litigation continues to inch toward trial. Now Dometic's Rule 56 motion seeks summary judgment on Counts VI, VII, VIII and IX of Zip Dee's Third Amended Complaint ("TAC")—the counts alleging that Dometic infringed Zip Dee's registered trademark and its common law trademark rights in the slatted awning cover configuration.[6]

Dometic advances two related arguments here in support of its motion for summary judgment. First Dometic claims that Zip Dee cannot have an enforceable trademark in the roll-up RV awnings with a slatted metal cover because that would contravene the policies underlying patent law, specifically the public's right to copy and use inventions once a patent expires. Dometic also argues that it is entitled to judgment on Zip Dee's trademark claims because the slatted awning cover is functional and therefore cannot qualify for trademark protection. Neither argument can really be addressed without first setting the stage by discussing the tension between patent and trademark policy at work here, and correspondingly the law that is to be applied.

### Policies Underlying Patent and Trademark Law

By now it is axiomatic that the patent and trademark laws protect different interests (see *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657–58 (7th Cir.1995)). Trademark law is aimed at assisting consumers in identifying the source of goods, a goal served by granting an indefinite monopoly to the user of a particular unique symbol that connects a product with its source (*id.* at 657). If a symbol is entitled to trademark protection, the holder of that mark has an exclusive right to use the symbol to identify the holder's product and can bar others from using the mark, thus protecting consumers from confusedly thinking that they are buying the manufacturer's product when they are instead purchasing an imitation. Although the granting of such a monopoly might seem counterintuitive to fundamental notions of free market competition, that misperception is dispelled by a rather straightforward explanation (*id.*, footnote omitted):

> Allowing a particular producer to monopolize a symbol in this way is no burden on competition, the theory goes, because symbols are a dime a dozen. The only value of the initially arbitrary symbol comes from its association with the producer's products and the good or bad will consumers feel toward that producer is based on the quality of those products. Because the symbol itself adds nothing to the product, consumer desire for products marketed with that symbol must derive solely from the belief that the products bearing the mark originated with the producer for whom the consumers have developed the goodwill. Therefore, the only reason a competitor would copy a mark would be to pass off his product as that of the original producer.

So far so good. But the water gets decidedly murkier when it comes to a product configuration trademark such as the one claimed by Zip Dee here. Product configurations can be trademarked (*W.T. Rogers Co. v. Keene*, 778 F.2d 334, 337 (7th Cir.1985)) if the manufacturer can show that the configuration is either inherently distinctive or has acquired distinctiveness through secondary meaning, as well as showing the likelihood of confusion (*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992)). In other words, if the configuration of a product is the vehicle through which consumers connect the source with the product—playing the same role of "source signifier" that a word or symbol does in the more traditional trademark context—then that product configuration *may* be enti-

---

still show that it is entitled to assert common law trademark rights (see 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.21[1][b] (3d ed. 1995)).

6. At least at this point Dometic does not attack the rest of the TAC, in which Zip Dee claims that Dometic has infringed its Patent No. 4,634,172 for a "Flexible Hinge Rain Sealing Mechanism" (the " '172 Patent").

tled to trademark protection if there is no conflict with the federal patent laws.

But such conflicts do sometimes occur because of the policies underlying the patent laws, and hence the need for the "may" qualifier. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146, 109 S.Ct. 971, 975, 103 L.Ed.2d 118 (1989) has pointed out that "[f]rom their inception, the federal patent laws have embodied a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of the competitive economy." *Bonito Boats, id.* at 150–51, 109 S.Ct. at 975 went on to describe that "careful balance":

> The applicant whose invention satisfies the requirements of novelty, nonobviousness, and utility, and who is willing to reveal to the public the substance of his discovery and "the best mode . . . of carrying out his invention," 35 U.S.C. § 112, is granted "the right to exclude others from making, using, or selling the invention throughout the United States," for a period of 17 years. 35 U.S.C. § 154. The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years. "[The inventor] may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to the community, the patent is granted. An exclusive enjoyment is guaranteed him for seventeen years, but upon expiration of that period, the knowledge of the invention inures to the people, who are thus enabled without restriction to practice it and profit by its use." *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 186–187, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933).

Essential to making that "bargain" work is the rule that the public has a federal right to copy and use the patented product once the patent has expired (*id.* at 165, 109 S.Ct. at 985; *Scott Paper Co. v. Marcalus Mfg. Co.*,

326 U.S. 249, 256, 66 S.Ct. 101, 104, 90 L.Ed. 47 (1945)).

At this point the tension between the considerations that underlie the patent laws and those that counsel granting a trademark on a product configuration comes into focus. On one hand the goal of trademark law (assisting the consumer by avoiding confusion as to a product's source) is sometimes served by allowing an indefinite monopoly on a particular product configuration. But at the same time the patent laws set out a detailed regimen of requirements that must be met before a 17–year monopoly will be conferred on an invention (via a utility patent), and when those sands run out the public has a right to engage in the slavish copying and use of the product. What happens at the intersection of those competing goals?

One way to reconcile the potential conflict is through the requirement that a product configuration cannot be trademarked if it is functional (*Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1188 (7th Cir. 1989)). Functionality of a product configuration refers to "something that other producers of the product in question would have to have as part of the product in order to be able to compete effectively in the market" (*W.T. Rogers*, 778 F.2d at 346). As *W.T. Rogers, id.* went on to say, "the feature is functional, as defined above, . . . only if without it other producers of the product could not compete effectively."

So if a particular product configuration is "one that [is] costly to design around or do without, rather than one that is costly to have" (*Schwinn Bicycle*, 870 F.2d at 1189), it cannot be trademarked. *Qualitex Co. v. Jacobson Products Co.*, —— U.S. ——, ——, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995) (citations omitted) explains why:

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§ 154, 173,

after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity). Functionality doctrine therefore would require, to take an imaginary example, that even if customers have come to identify the special illumination-enhancing shape of a new patented light bulb with a particular manufacturer, the manufacturer may not use that shape as a trademark, for doing so, after the patent had expired, would impede competition—not by protecting the reputation of the original bulb maker, but by frustrating competitors' legitimate efforts to produce an equivalent illumination-enhancing bulb.

But as *Vornado Air Circulation Sys., Inc. v. Duracraft Corp.,* 58 F.3d 1498, 1506–07 (10th Cir.1995) has recently pointed out—somewhat at odds with what has been assumed elsewhere (e.g., *W.T. Rogers,* 778 F.2d at 337; *Kohler Co. v. Moen Inc.,* 12 F.3d 632, 638 (7th Cir.1993))—functionality is really not a foolproof method of patrolling the line between the patent and trademark laws. That is because the showing required of a person seeking a patent is that an invention is useful—that it serves an identified beneficial purpose. By contrast, functionality for trademark purposes is based on competitive need—as *Qualitex,* —— U.S. at ——, 115 S.Ct. at 1304 puts it:

> This Court consequently has explained that, "[i]n general terms, a product feature is functional," and cannot serve as a trademark, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.[7]

Thus usefulness in the patent context does not equal functionality in the trademark context. There is a gap between "functionality" and "usefulness" through which some products could fall.

To bring this point into the real world, consider a hypothetical situation. Assume that Inventor creates a mousetrap that meets the usefulness test (as well as the other requirements) for a utility patent. For 17 years Inventor gets a monopoly on the production and sale of the mousetrap, which—although there are dozens of other competing mousetraps on the market, and although it may even cost more to produce (and so it may cost consumers more to buy)—finds a place in the market. When the patent expires Competitor begins to copy Inventor's mousetrap. Inventor (no longer able to block such copying through a patent infringement action) then sues Competitor for trademark infringement, claiming that Inventor is entitled to a product configuration trademark.[8]

In that scenario the functionality defense will not protect Competitor: It does not *need* that particular product configuration to compete effectively in the mousetrap market, because there are many other—indeed perhaps better—ways to build a mousetrap. But to allow Inventor to have a product configuration trademark would effectively extend his utility patent into eternity, far beyond the 17 years set out in the statutory patent bargain. In such a situation functionality alone is not enough to protect the "bargain" of the patent laws from invasion by a product configuration trademark.

To deal with that sort of problem, courts have traditionally relied on a general principle that, because there is a federal right to copy and use an invention upon expiration of a utility patent, trademark law cannot be used to provide a permanent monopoly on the same invention (e.g., *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 119–20, 59

---

7. [Footnote by this Court] *W.T. Rogers,* 778 F.2d at 346 had expressed the same concept in its earlier-quoted description of functionality:

   > Something that other producers of the product in question would have to have as part of the product in order to be able to compete effectively in the market.

8. Assume, too, that Inventor can prove either secondary meaning or inherent distinctiveness, and that consumers would likely be confused as to the source of the product if Consumer's version hit the streets.

S.Ct. 109, 113–14, 83 L.Ed. 73 (1938); *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 185–86, 16 S.Ct. 1002, 1008–09, 41 L.Ed. 118 (1896)). And as the just-completed discussion has shown, that general principle must apply irrespective of whether the subject of the expired patent is functional in the trademark sense.

But this is not such an easy case, for Zip Dee's alleged product configuration trademark presents a complicating wrinkle. Zip Dee is not (contrary to Dometic's assertions) directly seeking a product configuration on the RV awning that was disclosed in the '869 Patent, nor is it directly seeking a product configuration trademark on the inventions disclosed in any of its other patents. Instead Zip Dee claims that the slatted awning cover is something that consumers use to identify a Zip Dee RV awning, and it therefore seeks a product configuration trademark so that it can bar others from using slatted covers on their RV awnings. And instead of the slatted cover having been the gravamen of any of Zip Dee's now-expired patents, it was one (but not the only) embodiment of the '869 Patent (both parties admit that), it was disclosed as part of a dependent claim in two of Zip Dee's other patents, and it has been included as part of the preferred embodiment in yet another. Thus the precise issue before this Court is whether a product configuration that played some role—dependent claim, preferred embodiment or one embodiment—in a patented invention but that was not the invention itself can be the subject of a product configuration trademark.

That question was addressed last year in *Vornado*, the only case that has faced the issue squarely. There Vornado Air Systems had a live patent for a household fan that claimed a particular type of spiral grill. Its grill, the subject of a long-since-expired utility patent, could not have been independently patented because it was in the public domain as prior art (58 F.3d at 1500). It was also relevant that the spiral grill was not necessarily superior to, or cheaper to produce than, other grill designs (*id.* at 1501). Some time after Vornado Air Systems got its patent for the fan, Duracraft began to produce a competing household fan that, although it did not violate Vornado's patent, used the spiral grill design. Vornado filed suit, claiming that it had a product configuration trademark on the spiral grill. Its argument was accepted by the district court, which concluded that the spiral grill was nonfunctional because other grills were readily available that would enable competitors to compete in the market for household fans (*id.*).

That decision was reversed on appeal. After a lengthy review of the conflicts between the patent laws and product configuration trademarks under Lanham Act § 43(a), 15 U.S.C. § 1125(a), the Court of Appeals said, 58 F.3d at 1509–10 (citation and footnote omitted and emphasis added):

> Given, then, that core patent principles will be significantly undermined if we do not allow the copying in question, and peripheral Lanham Act protections will be denied if we do, our answer seems clear. Much has been said in this and other section 43(a) cases about whether a second competitor needs to use a particular product design to compete effectively. But where Lanham Act goals are not the only ones at stake, we must also examine the degree to which a first competitor needs to use a useful product feature instead of something else—a name, a label, a package—to establish its brand identity in the first place.

> It would defy logic to assume that there are not almost always many more ways to identify a product than there are ways to make it. And if one of the ways to configure the product itself has been deemed important enough to the advance of technology for the government to grant a utility patent, we must find its value as a product feature to exceed its value as a brand identifier in all but the most unusual cases.

> *We hold that where a disputed product configuration is part of a claim in a utility patent, and the configuration is a described, significant inventive aspect of the invention, see 35 U.S.C. § 112, so that without it the invention could not fairly be said to be the same invention, patent law prevents its protection as trade dress, even if the configuration is nonfunctional.*

In the short time since it came down, *Vornado* has not been the subject of much judicial discussion. In the only appellate decision to cite *Vornado* (*Thomas & Betts*, 65 F.3d at 660), our own Court of Appeals discussed the *Vornado* approach but found that it did not need to "pass on the correctness of *Vornado*" to reach its decision. Although Dometic makes the point with considerably less force than might have been expected,[9] Dometic argues that *Vornado* is the law to be applied here.

Zip Dee disagrees, pointing to a dictum in *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571 (Fed.Cir.1995) that hints that the Federal Circuit would not embrace the *Vornado* approach.[10] In *Elmer* the plaintiff was seeking a product configuration trademark that either matched or broadened the breadth of a live utility patent. *Elmer* shot down that claim as contrary to patent policy, but it went on to say that a less expansive attempt might be permissible [11] (*id.* at 1580) (citations omitted):

> Furthermore, once the '994 patent expires, the public will be entitled to practice the invention claimed in the patent. Enforcing a "trade dress" right defined, as it was here, to be essentially coextensive with, and in fact broader than, claim 1 of the '994 patent would frustrate that right because trade dress protection may last indefinitely and thus competitors could not

effectively "copy and use" the invention after the patent expires.[12] If the asserted trade dress had been narrowly defined to cover only one of the many product configurations within the scope of the claim, one might have a different case. In such case, upon expiration of the '994 patent competitors would be free to practice the '994 invention; they could sell "aerodynamic" vehicle-mounted signs. They simply could not choose a product configuration that would be confusingly similar to the trade dress of HTH's product. Here, however, the "trade dress" was broadly defined to be essentially coextensive with, and in fact broader than, the patent claim, and enforcing such a trade dress would effectively extend the life of the patent.

This Court is not, of course, bound by either *Vornado* or *Elmer*.[13] And because of the fact—as *Vornado* has pointed out—that in some cases functionality alone will not necessarily prevent product configuration trademarks from invading the turf rightly assigned to the patent laws, the reasoning in cases like *W.T. Rogers* is not on point. Zip Dee urges that *Elmer* is the way to go, but although the dictum in that case would certainly support Zip Dee's position it is expressed in conclusory rather than analytical terms, without expressly addressing the issues that led *Vornado* to take a different approach.[14]

9. Dometic cites *Vornado* only three times—at D.Mem. 23 and 29 and D.R.Mem. 7–8—and does not discuss the case at any length.

10. Zip Dee's expression of indignation that Dometic relies on a dictum in *Thomas & Betts* to support its argument (P.Mem. 11) is ironic, considering that Zip Dee points to what is clearly a dictum in *Elmer* to advance its own argument.

11. It should be noted that the stated reason for denial of the product configuration trademark was because the court found the asserted trade dress to be "primarily functional" (*Elmer*, 67 F.3d at 1580). But the reasoning quoted in the text would apply even if, as in the mousetrap hypothetical, the subject of the utility patent were nonfunctional.

12. [Footnote by this Court] Dometic Mem. 25–26 seeks to call *Elmer* to its own aid in an extended quotation (1) that begins with part of the paragraph of the opinion that precedes the language with which the text here begins and (2) that ends at the point of this footnote indicator. But it is

perfectly obvious that the true relevance of *Elmer* to this case is in its language that is next quoted in the text. As a lawyer's tactic such selective quotation is both misleading (see n. 18) and foolish—did Dometic's counsel really believe that this Court would content itself with reading the parties' briefs without going back on its own to read the cases on which they claim to rely (to say nothing of this Court's searching out other case law)?

13. This action involves both patent and trademark claims. As for the former, the exclusive appellate jurisdiction conferred on the Court of Appeals for the Federal Circuit causes that court's jurisprudence to provide the rules of decision for this case. But as to trademark issues, this Court's customary adherence to Seventh Circuit law controls.

14. Interestingly, *Elmer* does not discuss *Vornado* at all, even though three months intervened between the two decisions (*Vornado* was issued July 5, 1995, while *Elmer* came out October 10 of the

On the other hand, *Vornado* also leaves something to be desired. Although the point that functionality alone does not necessarily do the job is an important one, the rule set out in *Vornado* poses as many questions as it answers. For example, what is a "described, significant inventive aspect" of an invention? And what is contemplated by "could not fairly be said to be the same invention"?[15] Moreover, the general inference that *Vornado* seeks to draw—that the claiming of a product configuration in a utility patent is ipso facto determinative—is itself flawed. *Thomas & Betts*, 65 F.3d at 660 points out that a product configuration's inclusion within a claim in a utility patent does not necessarily mean that the product configuration is a "significant inventive aspect"—instead it could just as likely mean that the patent would not have issued without the inclusion of that limitation. Because *Vornado* goes into uncharted and undefined territory in articulating its test, any court that seeks to apply its doctrine is left without adequate guidance.

But *Vornado* does seem to embody a valuable notion, and this opinion will attempt to recast its reasoning into more familiar terms. What must be asked—and what *Vornado* seems to be getting at with its language referring to the "significant inventive aspect" and what "could not fairly be said to be the same invention"—is whether the granting of a trademark (and thus of an indefinite monopoly) on a product configuration that is claimed or otherwise disclosed as part of an invention covered by a utility patent would prevent the invention itself from being copied and used by the public.[16]

Another way of framing the same concept is to ask whether the product configuration is functional *within the context of* the utility patent. That involves borrowing both from *Vornado* and from the *Qualitex–W.T. Rogers*

formulations of functionality to produce this rule:

> Where a disputed product configuration is claimed as part of an invention covered by a utility patent, and where that product configuration is something that other persons seeking to copy or otherwise use the invention would have to include as part of the product to be able to compete effectively in the market in such copying or use, then the product configuration cannot be trademarked after the patent expires, even if the configuration is nonfunctional in the more general trademark sense.

Under that formulation the inquiry properly focuses on whether, after the patent has expired, the previously-patented invention could be practiced competitively without employing the disputed product configuration. If no other product configuration could be substituted for the one sought to be trademarked and still allow for competitive copying of the invention, then the granting of trademark protection would be contrary to the longstanding principle that dates back to *Kellogg* and *Singer,* because it would effectively undermine the federal right to copy and use the invention once the term of the patent has run out. In this Court's view, the suggested approach is easier to work with than *Vornado,* for it employs functionality language that is familiar to the courts asked to apply the rule.

■ In summary, then, the policies underlying patent law dictate the denial of trademark protection to a product configuration that has been claimed as part of a utility patent in either of two circumstances:[17]

1. if the product configuration is functional within the context of the utility patent in which the product configuration is claimed; or

same year) and even though the quoted dictum seems at odds with the *Vornado* approach.

**15.** This criticism of *Vornado* has also been voiced by the only law review treatment of the case (captioned *Tenth Circuit Applies 'Significant Inventive Aspect' Test to Determine Whether Utility Patent Precludes Trade Dress Protection,* 109 Harv.L.Rev. 1457, 1460–61 (1996)).

**16.** Plainly that would amount to an unlawful extension of the term of the patent monopoly.

**17.** Of course a failure to establish the other requirement for trademark protection (inherent distinctiveness or the acquisition of secondary meaning) would also be fatal to the party claiming such protection.

2. if the product configuration is functional in the more general sense that competitors in the market generally need that configuration in order to compete.

In the context of this case, an affirmative answer to either of those inquiries would mean that Zip Dee could not get a product configuration trademark on the slatted awning cover. With that framework in place, this opinion can now turn to Dometic's arguments on the issue of functionality.

*Extension of Monopoly of Expired Patents*

■ Dometic's first argument is that allowing Zip Dee to assert trademark rights in the slatted awning cover configuration would improperly extend the monopoly conferred by the expired '869 Patent (D.Mem. 20–23) as well as dozens of other expired patents held by third parties (D.Mem. 28–29). For that purpose Dometic charges Zip Dee with attempting to appropriate to its exclusive use the art of slatted metal structures, which Dometic traces back to 1850.[18] For Dometic this then becomes an easy case, because Dometic sees *Kellogg* and *Singer* as directly on point. But that contention must be rejected as a distortion of the breadth of Zip Dee's claimed trademark.

Zip Dee is urging that when people see a roll-up RV awning that has a slatted metal cover, that cover makes them think of Zip Dee. Clearly Zip Dee could not claim a trademark on the entire awning that was the subject of the '869 Patent—then *Kellogg* and *Singer* would be on all fours. Zip Dee is not, however, making such a sweeping claim—it is not trying to foreclose competitors from selling roll-up awnings for RVs. Instead Zip Dee is only trying to keep others from selling roll-up RV awnings that are guarded by a slatted metal protective cover, a product configuration that Zip Dee claims makes customers believe they are buying a Zip Dee awning. Hence Dometic's contention that Zip Dee is attempting to "extend its 17–year patent monopoly by seeking trademark protection for that invention" (D.Mem. 20) is dead wrong: Zip Dee is not trying to obtain a trademark on the invention that was the subject of the '869 Patent (the entire awning), but only on the use of a slatted metal protective cover in conjunction with a roll-up awning.

Dometic's attempted reliance on expired utility patents (dating back as far as 1932) for slatted metal awnings is just as misguided. In that respect Zip Dee is not claiming a monopoly on the right to make slatted awnings—indeed, its claim has nothing to do with the configuration of the awning itself. Again it seeks a trademark only on the use of slatted metal *covers* to protect RV awnings. Trademarks are after all limited to the specific context in which they serve as a source signifier. Dometic cannot point to expired (or live) utility patents for slatted awnings generally as the basis for its contention that Zip Dee is improperly attempting to extend a monopoly.[19] Essentially Dometic is mixing apples and oranges, and because this Court is not making fruit salad such an argument won't work.

*Functionality Within the Context of Zip Dee's Patents*

Next Dometic urges that Zip Dee's asserted trademark cannot be recognized because

18. Dometic's R.Mem. 1 goes overboard by stating that "the disclosure of the use of slatted metal *covers for awnings* in numerous third-party patents *for over a century* has dedicated the slatted metal *cover* to the public domain" (emphasis added). That is flat-out false, and Dometic's lawyers know it—what is old art is the use of slatted metal structures in general, not the specialized use of a slatted metal cover to shield a fabric awning—a use that was original to Zip Dee. Unfortunately, this litigation has been too much marked by such hyperbolic misstatements (with both sides having sinned in that respect, but with Dometic having practiced that art more frequently). Counsel apparently do not realize that, as with the boy who cried "Wolf!", such

tactics create the risk of tainting their more legitimate arguments.

19. Indeed, in a sense Dometic's emphasis on the long-established use of other slatted metal configurations, both in the manufacture of awnings and otherwise, cuts against its position on Zip Dee's trademark claim. That demonstrated lack of novelty of metal slatting as a concept may create a question of *fact* as to the existence of a secondary meaning (exclusive source identification) for Zip Dee's particular usage of metal slatting, not a rule of *law* based on the expired patents.

it was claimed or otherwise disclosed within Zip Dee's other utility patents. Dometic contends that Zip Dee is foreclosed from trademark protection because the '869 Patent was broad enough to cover the slatted awning cover. Dometic also seeks to fortify that argument by pointing to Zip Dee's Patent 4,576,192 ("'192 Patent") and to the '172 Patent, each of which included the slatted awning cover as a dependent claim, and to Zip Dee's Patent 4,195,877 ("'877 Patent"), which included the slatted awning cover in its preferred embodiment.

*'869 Patent*

■ As stated at the outset of the *Facts* section, the invention disclosed by the '869 Patent was a protected awning for an RV. In support of its argument that granting Zip Dee a product configuration trademark on a slatted cover in conjunction with the RV awning would eviscerate the public's right to copy and use the now-expired invention, Dometic points to the following language in independent claim 1 of the '869 Patent (D.Ex. 28 at col. 6–7):

What is claimed is:

1. An awning for a travel trailer or mobile home, said awning comprising ... a strip of metal secured to the opposite end of the flexible covering, with the opposite end of the metal strip attached to the side of the trailer so that when the flexible covering is rolled around said roller as when the awning is collapsed the flexible strip will be rolled around said flexible covering and form a casing therefor....

But any such argument is torpedoed by the fact that for the first two years of the patent's life (from 1967 through 1969)[20] Zip Dee used a single flexible sheet of stainless steel metal to form the protective cover (D.Ex. 27 at 2; D.Ex. 29). Then in 1969 Zip Dee began using the slatted awning cover. Dometic admits that the '869 Patent was broad enough to cover both types of metal cover (D.Mem. 10).

In terms of the pertinent question—whether it is possible to practice the invention disclosed in the '869 Patent if the slatted cover were to be taken away from the public on product configuration trademark grounds—Dometic surely has not carried its burden of showing that there is no genuine issue of material fact on that score. In addition to Zip Dee's own use of a single sheet metal cover from 1964 to 1969, other competitors seem to be producing recreational vehicle awnings similar to that covered by the '869 Patent without using the slatted metal configuration (see P.Ex. I).[21] To be sure, there may be some evidence that the slatted metal cover is the best way to practice the invention—the portions of the Robert Miller deposition in which he testifies that the slatted configuration offered better protection of the fabric and did not scratch or dent like the single sheet (D.Ex. 30 at 175)—but that is really irrelevant in light of the broader coverage of the '869 Patent.

*'192 Patent*

■ Dometic next looks to Zip Dee's '192 Patent for an "Awning Assembly," which Dometic claims "discloses and claims" the slatted awning configuration. At the outset it should be noted that unlike the '877 Patent and '172 Patent (both discussed below) the '192 Patent (like the '869 Patent) covers the awning assembly itself. That is clearly shown by the "Background of the Invention" section (D.Ex. 36 at col. 1):

---

**20.** Apparently that style of metal cover predated the issuance of the patent, having begun in 1964 when the awning with a protective metal cover was invented (D.Ex. 27 at 2).

**21.** Although it is difficult to tell from the advertisements alone, it appears that other companies have been able to practice the art that was the subject of the '869 Patent without using a slatted metal cover. For example, the awnings manufactured by Carefree (pictured in the advertisements in P.Ex. I at 6–8), Sun–Free (*id.* at 9), Colorado (*id.* at 11), Sidewinder (*id.* at 12), and Carter (*id.* at 13) all seem to use a single sheet

metal cover in copying the Zip Dee awning. Moreover, the "Coleman Faulkner UltraVisions Acrylic RV Awnings feature an affordable vinyl weatherguard as opposed to the more expensive metalwrap used on all other acrylic awnings on the market" (P.Ex. I at 3). Of course whether the other products practice the art disclosed by the '869 Patent is a question of fact that must be decided by the factfinder. Nonetheless the possibility that Zip Dee could prove that at trial (seemingly a strong possibility indeed) spells doom for Dometic's present summary judgment bid.

Although the awning there disclosed [in the '869 Patent] was entirely satisfactory for its intended purpose, there were certain shortcomings evidenced in the awning which have been corrected by the subject invention. Principally, it was found that the bracing members were cumbersome and difficult to use. In addition, the fact that the brace members connected to mechanism on the side of the trailer caused difficulties to owners in erecting the awning and adapting their trailers for use therewith. These difficulties have been overcome by the subject invention.

Unsurprisingly, then, the lone independent claim in the '192 Patent is similar to the lone independent claim in the '869 Patent in terms of the level of generality with which it refers to the awning's protective cover. Independent claim 1 of the '192 Patent describes "a flexible strip secured to the opposite end of said flexible covering to form a casing therefor when said flexible covering is completely rolled around said roller" (D.Ex. 36 at col. 6). Independent claim 1 of the '869 Patent was in much the same vein in the respect that is relevant here (D.Ex. 28 at col. 6–7, quoted in the preceding section). Indeed, Dometic's contention may be even weaker as to the '192 Patent's independent claim, for it does not even specify that the awning cover must be metal.

But the '192 Patent goes on with the following dependent claims 2 and 3 (D.Ex. 36 at col. 6):

2. The awning of claim 1, wherein said flexible strip comprises a series of interconnected metal plates.

3. The awning of claim 2, wherein each plate in said flexible strip has one rod like longitudinal edge and one C-shaped longitudinal edge shaped and dimensioned to receive therein the rod like longitudinal edge of an adjacent plate and to trap same while permitting relative movement between adjacent interconnected plates.

Moreover, the '192 Patent also specifically discloses the slatted metal cover in its "Description of the Preferred Embodiment" (*id.* at col. 4–5) and includes it as part of illustrative Figure 2. That being so, Dometic urges that allowing Zip Dee to have a product

configuration trademark on the slatted awning arrangement would necessarily undermine the patent laws, because the public would still be unable to utilize that type of awning assembly even after the '192 Patent expires.

That ipso facto argument overstates the significance of dependent claims. Dependent claims are used to limit independent claims by adding an additional element or elements. To prove infringement of a dependent claim, the patent holder must prove each of the elements of the incorporated independent claim as well as the added elements of the dependent claim (*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 685–86 (Fed.Cir.1990)). Thus if during the life of a patent a competitor can avoid any of the elements of the independent claim so as not to be an infringer of the independent claim, a fortiori the competitor does not infringe a dependent claim that incorporates the independent claim. In terms of this case, a competitor could not be said to infringe claim 2 or 3 of the '192 Patent unless the competitor also infringes independent claim 1.

What is the purpose of dependent claims if the patent holder must be able to recover on the independent claim anyway before it can recover on a dependent claim? There is surprisingly little written to address that question, but a few reasons come to mind. One is that dependent claims may serve as an aid in construing the language in the independent claims that they incorporate. Although a dependent claim's limitation cannot be read into an independent claim to help it survive a charge of invalidity (*Wolens v. F.W. Woolworth Co.*, 703 F.2d 983, 988 (7th Cir.1983)), the court can look to one claim in an attempt to interpret the terms of another claim—indeed the doctrine of claim differentiation requires that to be done (see *United States v. Telectronics, Inc.*, 857 F.2d 778, 783–84 (Fed.Cir.1988)). So for example if one element of an independent claim X is a rod that is "sufficiently long" to connect A and B, then a dependent claim that includes "the rod of claim X, wherein the rod is at least fifteen inches long" could help to avoid future prosecution or litigation problems.

Perhaps more importantly, a dependent claim can save a patent if the independent claim fails. Independent claims are generally drawn as broadly as possible so as to include all possible embodiments of the invention, including those that exist and those that are yet to be conceptualized. That attempt to maximize the breadth of an independent claim may later cause it to be held to be obvious from or anticipated by the prior art. Dependent claims could save the day, however, if the additional limitations included in a dependent claim would meet the otherwise unsatisfied test of nonobviousness or nonanticipation (see *Wilson Sporting Goods*, 904 F.2d at 685–86 (1990)).[22]

What does that say about the relevance to the current dispute of the inclusion of a product configuration as a dependent claim in a utility patent? Remember the reason that when a product configuration is actually included as an element in an independent claim,[23] it would conflict with the purpose of the patent laws if a court were to confer a further monopoly (via a trademark) on that product configuration. That is so because the identification as to source that is the core element of trademark protection would be the direct consequence of the patentee's ability to have excluded all others from practicing the product configuration during the life of the patent. It is no great trick to build up secondary meaning in a product configuration if the normal forces of competition are kept from utilizing that configuration for 17 years by the sword and shield of patent protection. In that circumstance the patent itself serves as the springboard for converting a legislatively-created 17 year monopoly into a court-enforced permanent monopoly—an impermissible result.

But where as here the product configuration is *not* imbedded within the principal claim of the patent, being found instead only in a dependent claim or claims, that same analysis may or may not apply. After all, such secondary placement means that even during the life of the patent the entire world is able to use the product configuration in every way except in linkage with the subject matter of the principal claim. And so the question of post-patent trademark protection of the product configuration would appear to be a function of whether the patentee's establishment of an exclusive source identification for that configuration—which it should be repeated has not been an element of the independent patent claim—owes its existence to the patent monopoly itself.

To apply that concept in the context of the current dispute, during the term of the '192 Patent anyone has been and continues to be free to use a slatted configuration like that employed by Zip Dee in every possible way *except* in conjunction with the awning arrangement disclosed by the patent's independent claim 1. If that has been a meaningful real-world opportunity, it would necessarily have made it correspondingly more difficult for Zip Dee to have established an exclusive source identification—secondary meaning—for that configuration. And that being so, the acquisition of such source identification would not necessarily be ascribable to the existence of the patent that has insulated Zip Dee against competition, *but not against competition as to the use of a slatted configuration as such.* It would not then do violence to the patent law's limited-term monopoly to allow trademark protection for the configuration that was not exclusive to the patentee. On the other hand, if the opportunity to employ slatted configurations has not been meaningful in a realistic sense because of the very existence of the patent, the policy underpinning of patent protection (limited-term monopoly at the price of dedication of the subject matter to unfettered competition when the term ends) would be frustrated by an extension of the monopoly for the indefinite future.

**22.** Picture an independent claim as a fence around a broad pasture, and the dependent claim as a fenced-in corral within the fenced-in pasture. If for some reason the fence around the pasture broke, horses in the corral would still be penned in even though horses held only by the fence surrounding the pasture would escape. In this analogy the corral—like a dependent claim—is critical only if the outer fence breaks.

**23.** That would be so, for example, if independent claim 1 of the '192 Patent had specifically included the language of claim 3.

Hence disclosing a product configuration as a dependent claim says nothing per se: the "functionality within the context of the utility patent" test will divulge which of the just-described alternatives applies. At this stage of the proceeding further facts must be adduced to apply that test, and at a minimum that spells defeat for Dometic's summary judgment claim.

*'877 Patent*

■ Dometic's argument based on the '877 Patent fares no better. That patent, which is for an "Exterior Room for a Trailer," mentions the slatted awning cover configuration only in passing as part of the preferred embodiment. Unlike its role in the '192 Patent, the slatted awning cover is not an element of any claim in the '877 Patent. In fact the only times that the slatted awning cover is mentioned there are in the illustrations and in this passage from the "Description of the Preferred Embodiment" section (D.Ex. 37 at col. 2) (emphasis added, reference numbers omitted):

> An awning rail is secured along one side of the side wall of the trailer in the usual fashion to which is connected *an awning case, usually made of metal.*

Thus Dometic has even less to lean on than it did in the context of the '869 and '192 Patents. Surely there remains the potential that a factfinder could reach the same pro-Zip Dee conclusions that were identified as possible in the earlier analyses. Dometic has proffered nothing to foreclose that possibility, so that summary judgment cannot be granted in its favor.

*'172 Patent*

■ That leaves only the '172 Patent for a "Flexible Hinge Rain Sealing Mechanism" (D.Ex. 38). Dometic treats the '172 Patent much less extensively than the '869 or '192 Patents, and in terms of Dometic's analysis what has already been said controls here as well.

Like Zip Dee's other patents, the '172 Patent does not set out the slatted metal cover as an element of its independent claim. Instead it includes as one of the elements of independent claim 1 "[a] flexible connector for connecting a metal awning cover to a vehicle." Dependent claim 15 then reads as follows (D.Ex. 38 at col. 6):

> 15. The combination of claim 10, wherein said metal cover has a plurality of slats each having a rail C-shaped in transverse cross section at one end thereof, the slat receiving one of said rods having two rails C-shaped in transverse cross-section, each of said rails having the same configuration in transverse cross-section one for connection to said strip the other for connection to another slat of said metal cover.

Zip Dee also included a description of the slatted metal cover in its preferred embodiment and showed a slatted metal cover in its illustrations of the invention. In those terms the '172 Patent is susceptible to the same analysis as the '869 and '192 Patents.[24]

*Functionality or Nonfunctionality of the Slatted Awning Cover Configuration*

■ Dometic also retreats one step to argue that the slatted awning cover is functional in the context of roll-up RV awnings generally. Essentially its argument is that no one could compete effectively in the market for roll-up RV awnings if it were not allowed to use a slatted metal cover. Dometic points to several different pieces of evidence in its attempt to show that:

> 1. the already-mentioned issuance of twenty-five patents for slatted awnings to third parties;
>
> 2. the also-already-discussed disclosure of the slatted awning cover in a dependent claim or as a preferred embodiment in four Zip Dee patents; and
>
> 3. Zip Dee's own admissions and promotional materials.

---

**24.** Because this section of the opinion ends here, this is also as good a place as any to dispose of Dometic's argument that the federal right to copy "extends to products that are identical copies and as to which there may otherwise may be 'confusion' over who manufactured the product if those products were not clearly labelled" (D.Mem. 29–31). That argument frankly makes no sense, and at any rate it is foreclosed by the possibility that Zip Dee could show that it *is* entitled to trademark protection.

Dometic also claims that Zip Dee is statutorily estopped from claiming that the slatted awning cover is nonfunctional because of representations that it made to the Patent and Trademark Office in seeking its patents.

Dometic's first argument has once again missed the point (made earlier in this opinion) that a slatted metal cover on an RV's roll-up fabric awning is a product entirely different from a roll-up awning that itself comprises only metal strips. Expired utility patents for roll-up slatted awnings simply do not provide relevant evidence as to whether the slatted awning covers on a roll-up RV awning are functional. Again Zip Dee is not seeking a trademark on roll-up slatted awnings generally, but only on the metal slat configuration of a protective cover for RV awnings.

Dometic also stresses Zip Dee's inclusion of the slatted awning cover as a dependent claim in its '192 and '172 patents and as the preferred embodiment in the '192, '877 and '172 patents. For the same reasons discussed in the preceding section, such inclusion does not of itself carry the day. After all, the classic functionality question is whether the slatted awning cover configuration is something that others in the industry must practice if they hope to be competitive. And there is strong evidence in the record that indicates a negative answer to that question: the competing awnings shown in P.Ex. I (discussed in n. 21). If others have been able to compete in the RV awning market with a protective cover formed by a single sheet of metal or vinyl, Dometic is hard-pressed to suggest as a matter of law that competitors need the slatted awning cover to operate in the marketplace.

Dometic also urges that Zip Dee's own conduct—its admissions in a deposition as well as its own promotional materials—prove that the slatted awning cover is functional. Advanced (as they are) as asserted conclusions of law, that set of contentions is not at all convincing.

For one thing, Dometic refers to a deposition of Robert Miller taken in conjunction with the California litigation, in which he spoke of Zip Dee's switch from a cover consisting of a single piece of stainless steel to the slatted cover configuration (D.Ex. 30 at 173–75):

> Stainless steel sheet metal would take on scuffs and ... scratches, didn't look as bright as we would like it.

> We wanted something that offered more protection. It was very thin metal; so it didn't offer as much protection to the awning as aluminum.

> It wasn't as good a container as the slats. Like getting hit, it would take dents and scuffs and would show. It would distort the case.

If admissible,[25] that might perhaps be viewed by a factfinder as supporting Dometic's position on the functionality issue. But it would also seem that Miller's deposition testimony could be considered as relating more to Zip Dee's own business decision than to the market feasibility of other awning covers. And the inappropriateness of summary judgment is confirmed by the existence of strong evidence going the other way.

Dometic also contends that Zip Dee's advertisements promoted the "utilitarian benefits" (D.Mem. 36) of the slatted covers. It emphasizes the language of one advertisement in particular (D.Ex. 35):

> Five interlocking, aluminum slats that wrap around the roller and fabric. The case forms and opens automatically as you use the awning because it is an extension of the fabric, not a separate box.

> ● Proven wrap-around design. 7 years of satisfied customers vouch for its effectiveness. You won't be testing a new, unproven product.

> ● Nothing to flip, clamp, snap or strap.

> ● Hard, clear anodized finish that resists dirt and abrasion.

> ● Quick and easy protective storage, automatically as you use the awning. No extra steps.

> ● Safer for travel than flip open boxes.

---

25. Miller also testified that the change from the single sheet of metal to the slatted cover was not his decision (*id.* at 174) and that his testimony was based solely on what he was told by Henry Duda, the inventor of the awning.

- Worry free. Slats interlock for the full length of the awning; no springs, clips or latches to loosen or break.
- More reliable than cloth or plastic covers. Aluminum won't wear or fade; won't warp or crack like plastic.
- Attractive polished aluminum finish will blend with any color Rec–Vehicle.
- Increase fabric life by providing year around protection against sun, rain, dirt and abrasion.

These are some reasons why Zip Dee has a better case, and the case is just another reason why Zip Dee is a better awning.

To be sure, that ad does feature Zip Dee's slatted covers (though it is also true that the ad touts the superiority of an RV awning with *any* attached protective cover to an uncased awning, and that many of the same arguments could be advanced in favor of the single sheet cover as well). But at most that would tend to show that the slatted cover is a good way—even Zip Dee's preferred way—of producing a metal cover for RV awnings. It has not at all shown the essentiality of that configuration, which is the essence of functionality. As already said earlier, Dometic is not entitled to summary judgment on its functionality argument.

Lastly, Dometic's statutory estoppel argument is not persuasive either. To prove statutory estoppel, Zip Dee must show (*Technicon Medical Info. Sys. Corp. v. Green Bay Packaging, Inc.*, 687 F.2d 1032, 1034 (7th Cir.1982)):

1) assertion by a party of entitlement to statutory right or privilege;

2) the receipt by that party of an actual benefit pursuant to the statute;

3) subsequent assertion by that party which is inconsistent with entitlement to the statutory benefit previously received.

As Dometic would have it, in order to receive its patents Zip Dee argued to the Patent and Trademark Office that the slatted awning cover was useful, rendering inconsistent its present position that the slatted covers are nonfunctional.

Even if it is assumed that Zip Dee did make the usefulness argument to get its patents, Dometic is mistaken in equating the "useful" requirement for receiving a patent with "functional" in the trademark context. *Vornado* and earlier portions of this opinion have explained why that is not so. "Functional" is a term of art, denoting something essential to competition in a particular market. Thus a product can be useful in the patent sense while nonfunctional in the trademark context—for example, the mousetrap hypothetical set out earlier in this opinion. Because Dometic's statutory estoppel argument is built on a faulty foundation, it too must be rejected.

### Conclusion

There are genuine issues of material fact as to whether Zip Dee could prevail on its trademark infringement claims. Consequently Dometic has not carried its burden of showing that it is entitled to a judgment as a matter of law. Its motion for partial summary judgment is denied.