**THOMAS & BETTS CORPORATION and Thomas & Betts Holdings, Inc., Plaintiffs,**

v.

**PANDUIT CORPORATION, Defendant.**

**No. 94 C 2656.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 15, 1996.

Sidney David, Keith E. Gilman, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, New Jersey, Marc L. Fogelberg, McBride, Baker & Coles, Chicago, Illinois, James Hay, Lewis & McKenna, Saddle River, New Jersey, for Plaintiffs.

David C. Hilliard, John Thompson Brown, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, Illinois, for Defendant.

### MEMORANDUM OPINION AND ORDER

DENLOW, United States Magistrate Judge.

Plaintiffs Thomas & Betts Corporation and Thomas & Betts Holdings, Inc. (hereinafter collectively referred to as "T & B"), bring this action in five counts against defendant Panduit Corporation (hereinafter "Panduit"). Count I alleges that Panduit's metal barb oval head shaped cable tie infringes on the trade dress of T & B's cable tie in violation of 15 U.S.C. § 1125(a) (hereinafter the "Lanham Act"). Count II alleges that Panduit's use of the name BARB–TY constitutes unfair competition and seeks cancellation of Panduit's trademark registration of the term BARB–TY under 15 U.S.C. § 1064(3). T & B also alleges that Panduit's conduct violates the common law of unfair competition (Count III); the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 and the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* (Count IV); and the Illinois Anti–Dilution Act, 765 ILCS 1035/15 (Count V).

T & B previously moved for a preliminary injunction which was granted by the trial court (1994 WL 714619), and later reversed by the Seventh Circuit. (*Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654 (7th Cir.1995)). Panduit now moves for summary judgment on all five counts. The Court held an extensive oral argument on July 11, 1996 and has reviewed the voluminous briefs and exhibits submitted by the parties. For the reasons set forth below, Panduit's motion for

summary judgment is granted on Counts I, III, IV and V and denied as to Count II of plaintiff's complaint.

## I. BACKGROUND FACTS

T & B and Panduit are the nation's largest suppliers of cable ties. Cable ties are nylon plastic straps used to tie together a group of cables or wires. (T & B 12 N p. 26 ¶ 1). Cable ties consist of a strap terminating at one end in a tapered tail and at the other in a head which incorporates a horizontal locking mechanism. *Id.* Cable ties feature two types of locking mechanisms: one-piece or two-piece. (T & B 12 N p. 26 ¶ 2). At issue here is a two-piece cable tie. In the two-piece tie a metal barb is inserted into the head of the tie and sits in a slot transverse to the slit for the strap. *Id.* When the strap is pulled taut, the tension on the strap causes the flexed barb to bite into the nylon strap and hold tight.

For purposes of this motion, the following uncontested facts are adopted from the Seventh Circuit opinion. (*See* 65 F.3d 654). In 1965, T & B obtained a patent on the two-piece cable tie ("the Schwester patent"). That patent disclosed a two-piece cable tie with an oval head, metal barb and transverse slot. The slot, barb and head portions are elements in each of the Schwester patent's claims. The oval shape of the head is not specifically claimed but is illustrated and described in the specifications. T & B currently markets a two-piece cable tie under the trademark TY–RAP that is essentially identical to the model disclosed in the Schwester patent. Though the Schwester patent expired in 1982 and a related patent also held by T & B expired in 1986, until 1993 T & B remained the sole producer of two-piece cable ties with annual sales of almost $100 million worldwide.

In 1993, Panduit entered the two-piece cable tie market with the BARB–TY, an oval-headed, metal-barbed cable tie essentially identical to T & B's TY–RAP. T & B promptly sued Panduit for trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). T & B claimed that its trade dress includes a rounded, low profile head configuration with a vertical slot which is aligned with the body of the cable tie and, in the case of Thomas & Betts' dominant product, includes a metal barb visible in the lower portion of the vertical slot. T & B also brought a federal unfair competition claim based on Panduit's use of the BARB–TY trademark and ancillary state law claims.

T & B moved for a preliminary injunction prohibiting Panduit from selling its BARB–TY. After an evidentiary hearing, the trial court found that "the transverse slot, the vertical slot, the steel barb and the tail or body" were all "functional parts" and thus not entitled to trade dress protection, but that the oval shape of the head was not functional and thus was protectable trade dress. The trial judge preliminarily enjoined Panduit "from further sales, advertising, promotion, or marketing of cable ties incorporating a steel barb locking mechanism with an oval shaped head and a transverse or vertical slot in the head." 1994 WL 714619 *25.

Panduit appealed and the Seventh Circuit reversed the preliminary injunction finding that T & B had not established a reasonable likelihood of success on the merits of its claim that T & B's cable tie had acquired secondary meaning and that its features are protectable trade dress. *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654 (7th Cir.1995). Panduit now moves for summary judgment on all counts.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Celotex Corporation v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

When reviewing the record on summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmovant. *Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 667 (7th

Cir.1995). To avert summary judgment, however, plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A dispute about a material fact is genuine only if the evidence presented is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A summary judgment proceeding is not a vehicle for the resolution of factual disputes; it is designed to determine whether there is any material dispute of fact that requires a trial. *Id.* If no reasonable jury could find for the party opposing the motion, it must be granted. *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

## III. DISCUSSION

The question in this case arises at the intersection of the Nation's patent and trademark laws and raises a host of novel and fascinating legal issues. First, the case raises the question of what weight should be given to factual findings made in connection with the motion for preliminary injunction when deciding the current motion for summary judgment. Second, the principal issue concerns the relationship between the Patent Act and the Lanham Act and whether the oval head disclosed in T & B's expired utility patent can be protected as trade dress under the Lanham Act. Third, the Court considers the propriety of Panduit's BARB–TY trademark. Finally, we consider the state law claims of unfair competition and deceptive trade practices.

Panduit advances several arguments in support of its motion for summary judgment on the federal claims raised in Counts I and II. First, Panduit claims that T & B cannot receive trademark protection in the oval head shape of its cable tie contained in its expired utility patent because that would contravene the public's right to copy and to use inventions once a patent expires. Second, Panduit argues that it is entitled to judgment on T & B's trademark claims because the oval head shape of the cable tie is functional and there-

fore cannot qualify for trade dress protection. Third, Panduit argues that even if the oval head is deemed non-functional, in which case it may be entitled to trademark protection, T & B has failed to show that the oval head shape of the TY–RAP cable tie has acquired secondary meaning. Panduit also argues that T & B has failed to show that T & B's TY–RAP cable ties will be confused with Panduit's BARB–TY cable ties. Finally, Panduit asserts that T & B may not prohibit its use of the term BARB–TY to describe their cable tie.

The Court will discuss each of these arguments in turn while viewing the evidence and drawing all inferences in the light most favorable to T & B. Under the standards for summary judgment, such an examination of the facts is required. Thereafter, the Court will consider the state law claims raised in Counts III through V.

### A. WEIGHT TO BE GIVEN TO PREVIOUS FINDINGS OF CONTESTED FACT

■ The first issue is what weight this Court should assign in deciding Panduit's motion for summary judgment to the trial court's or Seventh Circuit's factual findings in their preliminary injunction rulings. Because parties are held to different standards of proof in preliminary injunction hearings than in motions for summary judgment, and because findings of fact at the preliminary injunction stage are not as fully fleshed out as at the summary judgment stage, this Court will not rely on the trial court's or Seventh Circuit's findings of *contested* facts in deciding Panduit's motion for summary judgment. (Emphasis Added). *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) ("... the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits").

The Seventh Circuit has announced this rationale, stating:

A court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment for two reasons.

First, a court's findings of fact and conclusions of law at the preliminary injunction stage are often based on incomplete evidence and a relatively hurried consideration of the issues. [cite omitted]. Second, the questions focused on differ in deciding a motion for summary judgment. In the former a court considers whether there is a reasonable likelihood that the moving party will prevail on the merits; in the latter, a court considers whether there is any issue of material fact remaining after construing the facts in a light most favorable to the non-moving party.

*Communications Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir.1985); see also, *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc.*, 991 F.2d 1249, 1258 (7th Cir.1993) ("Caution is also necessary because a motion for summary judgment raises a different decisional question for the judge than does a motion for a preliminary injunction").

## B. RELATIONSHIP BETWEEN PATENT AND TRADEMARK LAW

The principal issue before the Court is whether the subject of an expired utility patent, T & B's two-piece cable tie with an oval head, may be entitled to trade dress protection under the Lanham Act or whether Panduit has an absolute right to copy T & B's expired cable tie patent. Secondarily, the Court will consider whether any fact questions are raised or whether this issue can be decided as a matter of law.

These issues require the Court to harmonize the Patent Act and the Lanham Act. In performing the task of reconciling these two statutes, we have been instructed by the Supreme Court that "where two statutes are capable of coexistence, it is the duty of the court, absent a clearly expressed intention to the contrary, to regard each as effective." *Ruckelshaus v. Monsanto Company*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984). Clearly, Congress intends both the Patent Act and the Lanham Act to coexist. An analysis of these two statutes and their purposes will help frame our discussion.

### 1. The Patent Act

Article I, § 8, cl. 8, of the Constitution gives Congress the power "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." In *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262, 99 S.Ct. 1096, 1099, 59 L.Ed.2d 296 (1979), the Supreme Court described the policies underlying the federal patent law as follows:

First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public.

The patent statutes require that a patent describe the exact scope of the invention and its manufacture to "secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." *McClain v. Ortmayer*, 141 U.S. 419, 424, 12 S.Ct. 76, 77, 35 L.Ed. 800 (1891). Our current system provides that a patent document contain two distinct elements. The first is a specification describing the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. The second element is that the patent "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Id.* "A claim covers and secures a process, a machine, a manufacture, a composition of matter, or a design, but never the function or result of either, not the scientific explanation of their operation." 6 Lipscomb, *Walker on Patents* § 21:17, at 315–16.

If an applicant can satisfy these requirements and is willing to reveal to the public the substance of his discovery and "the best mode ... of carrying out his invention," 35 U.S.C. § 112, the inventor is grant-

ed "the right to exclude others from making, using, or selling the invention throughout the United States," for a period of 17 years. 35 U.S.C. § 154. Thus, the inventor may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to the community, the patent is granted. An exclusive enjoyment is guaranteed for seventeen years, but upon expiration of that period, the knowledge of the invention inures to the people, who are thus enabled without restriction to practice it and profit by its use. *United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 186–87, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933). The federal patent laws embody a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are necessary to invention and constitute the lifeblood of a competitive economy. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 146, 109 S.Ct. 971, 975, 103 L.Ed.2d 118 (1989). "Copying is not only good, it is a federal right—a necessary component to the patent system's grant of limited monopolies." *Thomas & Betts Corporation v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995).

## 2. The Lanham Act

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of action for unprivileged imitation, including trade dress infringement. The Supreme Court identified the policies promoted by federal trademark law in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985):

The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the good will of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.

"Trademark law is aimed at assisting consumers in identifying the source of the goods, a goal served by granting an indefinite monopoly to the user of a particular unique symbol that connects a product with its source." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995).

## 3. Utility Patents

T & B is seeking trademark protection for the oval head of its cable tie contained in the expired Schwester utility patent. Utility patents are issued for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. As explained by Professor Herbert F. Schwartz:

A utility patent consists of a cover page that lists pertinent information, a written description, and one or more claims. The written description, sometimes referred to as the specification and drawings, describes the invention, the preferred embodiment of the invention, and how to make and use it, so that the public has available the information needed to practice the invention. On expiration of the patent, the public may practice the invention freely. The claims of the patent define the metes and bounds of the patent owner's exclusive rights during the life of the patent.

Schwartz, Patent Law & Practice, Second Edition, p. 7 (1995).

A review of the Schwester patent reveals that the oval head is in the drawing describing the invention of a self clinching bundling strap ("cable tie"). Furthermore, in the specification section of the patent the best mode description states that "[t]he opposite or head-end portion 24 of the strap 23 terminates in an *oval shaped* clinching eyelet 26 ..." (Nancy Clarke Declaration, June 13, 1996, Ex. 12). Furthermore, in the claim portion of the patent, the oval head is referred to in paragraph 1: "What is claimed is: 1. A self clinching bundling strap comprising a head-end portion, a tapered tail-end portion and a body portion therebetween, said head-end portion having a transverse aperture therethrough ..." *Id.* The head-end portion is the oval head which is now in dispute. T & B's counsel candidly acknowledged in oral argument, that subject to its Lanham Act argument, "anybody has the

absolute right to copy every detail in an expired patent." (7/11/96 Tr. at p. 28). Therefore, there is no dispute that under the Patent Act, Panduit had an absolute right to copy T & B's cable tie. This then brings us to the issue of whether the Lanham Act limits that right.

### 4. Vornado

The issue of whether the subject of an expired utility patent could receive trademark protection was first addressed by the Tenth Circuit in *Vornado Air Circulation Systems, Inc. v. Duracraft Corp.*, 58 F.3d 1498 (10th Cir.1995). The plaintiff alleged that the spiral configuration of the defendant's grill design infringed the plaintiff's trade dress. After a careful review of the two statutes, the court held that "[w]here a product configuration is a significant inventive component of an invention covered by a utility patent, so that without it the invention cannot fairly be said to be the same invention, patent policy dictates that it enter into the public domain when the utility patents [on the product] expire. To ensure that result, [the component] cannot receive trade dress protection under section 43(a)." 58 F.3d at 1500. The *Vornado* decision applies to those situations where components of an invention covered by an expired utility patent were being copied. However, the *Vornado* decision did not address whether a feature, which is not specifically claimed in the patent, can receive trademark protection upon the expiration of the utility patent.

In *Thomas & Betts*, the Seventh Circuit distinguished the *Vornado* decision on its facts, but stated that "it is not clear that the differences dictate a different result." 65 F.3d at 659. The Seventh Circuit found that the oval shape of the cable tie head was not specifically claimed in the Schwester patent, while the spiral grill was a required element in at least one of the claims in the patent at issue in *Vornado*. The Seventh Circuit did not pass on the correctness of *Vornado* or Panduit's broader claim that the Lanham Act does not bar its ability to copy the Schwester patent in toto, including the oval head disclosed in the drawings and specifications. That issue is now squarely before this Court.

### 5. Creating Harmony Between the Patent Act and the Lanham Act

T & B argues that the proper way to harmonize the Patent Act with the Lanham Act is to recognize a right under the Lanham Act to grant trademark protection to product configurations which are part of a patent by applying traditional tests of likelihood of confusion, functionality and distinctiveness. In particular, T & B relies upon the Seventh Circuit's language in *Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 638 (7th Cir.1993), that "courts have consistently held that a product's different qualities can be protected simultaneously, or successively, by more than one of the statutory means for protection of intellectual property." T & B argues that the successive application of the Lanham Act, following expiration of its patent, to protect the oval head of its cable tie is necessary and appropriate to enforce the strong public policies presented by the Lanham Act.

On the other hand, Panduit argues that a long line of Supreme Court cases interpreting the Patent Act require that it be permitted to copy the T & B cable tie upon expiration of the patent. Panduit argues that the way to harmonize the Patent Act and The Lanham Act upon the expiration of the patent is to allow T & B to obtain Lanham Act protection with respect to the packaging and advertising of the product, but not for the physical shape of the product and its oval head. The Court agrees.

The Court holds that the right to copy arising from the Patent Act entitles Panduit to copy the oval headed cable tie disclosed in the Schwester patent without fear of a Lanham Act violation. The Supreme Court and the Seventh Circuit have both recognized the primacy of the right to copy both before and after the adoption of the Lanham Act. Although the Lanham Act was not involved, the Court believes that the harmonization of the Lanham Act and Patent Act upon expiration of a patent can best be expressed as follows:

[T]he plaintiff has the right not to lose his customers through false representations that those are his wares which in fact are not, but he may not monopolize any design or pattern, however trifling. The defen-

dant, on the other hand, may copy plaintiff's goods slavishly down to the minutest detail: but he may not represent himself as the plaintiff in their sale.

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 157, 109 S.Ct. 971, 981, quoting *Crescent Tool Co. v. Kilborn & Bishop Co.,* 247 F. 299, 301 (2d Cir.1917) (L. Hand, J.). This result promotes fair competition and gives the public and the parties the benefits of both statutes. .

#### 6. Seventh Circuit Cases

■ The Seventh Circuit has not addressed the issue of whether an invention or a component of an invention covered by an expired utility patent is entitled to trademark protection. T & B relies heavily upon *W.T. Rogers Co., Inc. v. Keene,* 778 F.2d 334 (7th Cir.1985) and *Kohler Co. v. Moen, Inc.,* 12 F.3d 632 (7th Cir.1993), wherein the Seventh Circuit held that trade dress rights under the Lanham Act are distinct and exist separately from patent rights. A product configuration may be trademarked if the manufacturer can show that the configuration is either inherently distinctive or has acquired distinctiveness through secondary meaning, as well as showing the likelihood of confusion. *Kohler Co. v. Moen, Inc.,* 12 F.3d 632 (7th Cir.1993). Thus, if a product configuration acts as the product's "source identifier" then the product configuration *may* be entitled to trademark protection if there is no conflict with the federal patent laws. *Kohler* is distinguishable because it did not involve a utility patent. This is significant because T & B has already received its seventeen-year cable tie monopoly. In determining whether a product configuration is entitled to trademark protection courts have been asked to interpret the "careful balance" between the patent laws and the Lanham Act.

As Judge Shadur recently stated:

the goal of trademark law (assisting the consumer by avoiding confusion as to a product's source) is sometimes served by allowing an indefinite monopoly on a particular product configuration. But at the same time the patent laws set out a detailed regimen of requirements that must be met before a 17–year monopoly will be

conferred on an invention (via a utility patent), and when those sands run out the public has a right to engage in the slavish copying and use of the product. What happens at the intersection of those competing goals?

*Zip Dee, Inc. v. Dometic Corp.,* 931 F.Supp. 602 (N.D.Ill.1996).

■ The Seventh Circuit has determined that one way to deal with the potential conflict is to preclude trademark protection to product configurations if they are deemed functional. Functionality of a product configuration refers to "something that other producers of the product in question would have to have as part of the product in order to be able to compete effectively in the market." *W.T. Rogers Co. v. Keene,* 778 F.2d 334, 346 (7th Cir.1985). However, the Seventh Circuit has not yet decided whether the functionality test should apply where trademark protection sought is for a product configuration which is covered by an expired utility patent.

The Court holds that the application of a functionality test in this case is unsound public policy, contravenes the Patent Act and would defeat the expectations of the public and the parties. Such a result would promote litigation, not competition. When T & B obtained its patent, it clearly understood that once it disclosed its best mode that competitors would be entitled to copy and to use its invention after seventeen years. T & B's competitors understood that they would be free to copy and market T & B's invention after seventeen years. The public expected to receive the benefits of a competitive cable tie market after granting T & B a seventeen-year monopoly.

Anything less than a strict rule that the "best mode" disclosed in a patent can be copied would defeat these expectations. If a prospective competitor must face the threat of Lanham Act litigation for "slavishly copying" the invention, this would seriously undermine the Patent Act. Competitors would be hesitant to take advantage of inventions coming off patent for fear that the holders of the expired utility patent will argue, as they do here, that their product has gained secondary meaning and is protected by the Lan-

ham Act. Resolution of these issues could raise factual and legal questions which require trial and appeal. This is not part of the bargain that Congress intended or sought to encourage.

Similarly, the adoption of a functionality test would present the same problems and concerns. Functionality can become a complicated fact issue. The threat and reality of such litigation will harm the public by denying it the benefits of competition. A bright line test which permits "slavish copying" of the "best mode" invention disclosed in the expired utility patent best serves the public's interest as expressed by Congress in the Patent Act, while still preserving Lanham Act protection for methods of marketing the product so as to prevent source confusion.

T & B also relies upon the stay decision entered in this case by the Seventh Circuit on December 23, 1994 in which the court denied a stay pending appeal of the preliminary injunction stating in relevant part:

> Until 1982 the Thomas & Betts product had been protected by a patent. Panduit's theory is that when the patent expired the entire product fell into the public domain and became freely copyable. That considerably overstates matters. The patented portions of the product entered the public domain, but 'the product' did not. Panduit does not contend, for example, that it could copy the cable tie to the last detail, including the Thomas & Betts logo and similar identifying marks. Non-functional elements of the product's design can serve a role similar to logos and therefore may be protected as trademarks. See *W.T. Rogers Co. v. Keene*, 778 F.2d 334 [228 USPQ 145] (7th Cir.1985).

This decision is not dispositive because it has now been superseded by the decision reversing the preliminary injunction and it does not address the specific issue now raised for final judgment.

### 7. Expired Utility Patent May Be Copied Without Violating Lanham Act

■ We hold that the subject of an expired utility patent which is disclosed as the "best mode" in the patent cannot be the subject of trademark protection with respect to the invention disclosed to the public. A bright line test is important in order that the public receive the benefit of its bargain under the patent laws. Addressing the functionality of an invention covered by an expired utility patent would create needless fact questions and lead to unnecessary litigation which would stifle companies from utilizing products coming off patent.

In *Zip Dee, Inc. v. Dometic Corp.*, 931 F.Supp. 602 (N.D.Ill.1996), this court in an opinion by Judge Milton I. Shadur addressed the issue of whether a product configuration that played some role in a patented invention but that was not the invention itself can be the subject of a product configuration trademark. The plaintiff, an awnings manufacturer, brought a trade dress infringement action against the defendant alleging that the awnings produced by the defendant were infringing. The court held that "the policies underlying patent law dictate the denial of trademark protection to a product configuration that has been claimed as part of a utility patent in either of two circumstances (Footnote omitted): 1) if the product configuration is functional within the context of the utility patent in which the product configuration is claimed; or 2) if the product configuration is functional in the more general sense that competitors in the market generally need that configuration in order to compete." *Id.* at p. 611. Again, *Zip Dee* is a factually different situation because the defendant was copying a component of the patented invention so the court did not reach the issue of whether an invention covered by an expired utility patent could receive trademark protection under the Lanham Act.

In *Kransco Manufacturing Inc. v. Hayes Specialties Corp.*, 77 F.3d 503, 37 U.S.P.Q.2d 1722 (Fed.Cir.1996) (unpublished decision), the court held the plaintiff could claim trademark protection in their mark even though it was disclosed as part of the best mode for carrying out the invention described in the patent. The *Kransco* case is an unpublished decision which has no precedential value and contains no analysis of the interrelationship between the Patent Act and Lanham Act.

■ In those situations where the product configuration is not covered by an expired utility patent the *Kohler* decision and the functionality analysis is the appropriate method for determining whether trademark protection should be granted. No patent monopoly and bargain are involved. However, the Court does not believe the functionality analysis is appropriate in this case because the goals and policies of the patent laws would not be served. Judge Shadur illustrated the shortcomings of the functionality analysis in the following manner:

> Assume that Inventor creates a mousetrap that meets the usefulness test (as well as the other requirements) for a utility patent. For 17 years Inventor gets a monopoly on the production and sale of the mousetrap, which—although there are dozens of other competing mousetraps on the market, and although it may cost more to produce (and so it may cost consumers more to buy)—finds a place in the market. When the patent expires Competitor begins to copy Inventor's mousetrap. Inventor (no longer able to block such copying through a patent infringement action) then sues Competitor for trademark infringement, claiming that Inventor is entitled to a product configuration trademark. (Footnote omitted)

> In that scenario the functionality defense will not protect Competitor: It does not need that particular product configuration to compete effectively in the mousetrap market, because there are many other—indeed perhaps better—ways to build a mousetrap. But to allow Inventor to have a product configuration trademark would effectively extend his utility patent into eternity, far beyond the 17 years set out in the statutory patent bargain. In such a situation functionality alone is not enough to protect the "bargain" of the patent laws from invasion by a product configuration trademark.

*Zip Dee, Inc. v. Dometic Corp.*, 931 F.Supp. 602, 608 (N.D.Ill.1996).

■ As a matter of law, a product configuration that is claimed or otherwise disclosed within an expired utility patent is not entitled to trademark protection. "For al-most 100 years it has been well established that in the case of an expired patent, the federal patent laws do create a federal right to 'copy and to use'". *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165, 109 S.Ct. 971, 985, 103 L.Ed.2d 118 (1989). Also, upon the expiration of the utility patent the public, by way of the patent bargain, receives the right to make the invention in the form in which it was constructed in the patent. *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 119, 59 S.Ct. 109, 114, 83 L.Ed. 73 (1938). In *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256, 66 S.Ct. 101, 104, 90 L.Ed. 47 (1945), the Supreme Court held:

> [A]ny attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws ... By force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly.

The Supreme Court recently held that the construction of a patent, including the terms of art within its claim, is exclusively within the province of the Court. *Markman v. Westview Instruments, Inc.*, —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Therefore it is the determination of this Court that the oval shaped clinching eyelet is part of the claimed patent which was freely dedicated to the public upon expiration. Granting trademark protection in the oval head would effectively allow T & B to extend its utility patent into eternity and deprive the public of its benefit under the patent bargain.

T & B argues that the *Kohler* case establishes that trademark protection is available for product configurations. While this is true, *Kohler* does not address the situation of an expired utility patent. Where the product configuration is covered by a utility patent the long standing tradition of *Kellogg, Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118 (1896), *Scott and Bonito Boats*, as well as the public's right to copy patented products must prevail. The

only obligation Panduit had towards T & B when it copied its cable tie was to identify its own product, packaging and advertising to ensure that the public would not mistake the source of its BARB–TY.

T & B's counsel also argues that *Kellogg* and its progeny are inapplicable to the present case because they were decided prior to the Lanham Act. However, today's decision is consistent with the Supreme Court's decisions in this area and the Lanham Act. Trademark protection for product configurations has not been eviscerated. Holding that product configurations covered by utility patents are not entitled to trademark protection does not preclude trademark protection for product configurations in general, nor does it prevent T & B from seeking trademark protection for its packaging, its TY–RAP mark or its other methods of identifying T & B as the source of its cable ties to avoid confusion. What is precluded are attempts to seek trademark protection for the physical shape of the product when it is the subject of an expired utility patent.

## C. FUNCTIONALITY OF THE CABLE TIE'S OVAL HEAD

Because this case represents an issue of first impression in this circuit, in the interests of judicial economy, the court will assume *arguendo* that the Patent Act does not prevent T & B's oval headed cable tie from being entitled to trademark protection under the Lanham Act. The court will discuss, under the familiar principles of summary judgment, whether a fact question exists regarding whether T & B is entitled to trademark protection applying the functionality test as urged by T & B.

In this circuit functionality is an affirmative defense as to which the defendant bears the burden of proof. *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir.1994). Functional features of trade dress are not entitled to trademark protection under the Lanham Act. 1 McCarthy § 7.26[1] at 7–113. Protection for product shapes which are functional is the subject of patent law, not trademark law. *Id.* § 6.03[4] at 6–15. "The non-functionality requirement of trade dress law was created to avoid a

clash with federal patent law. The public policy behind the requirements of non-functionality is that if a configuration is functional, then everyone has the right to use the configuration for its functional purpose, subject only to such exclusive right for a limited time as may exist under the patent laws." *Id.*

A product feature is functional if "it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982). "To establish functionality a junior user need not prove that the copied feature was optimal." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1189 (7th Cir. 1989). He need only establish that the copied feature is " 'at least one, of a few superior designs for its *de facto* purpose.' " *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 340 (7th Cir.1985), quoting *In Re Bose Corp.*, 772 F.2d 866, 872 (Fed.Cir.1985). "[I]f the feature is not ornamental or fanciful or whimsical or arbitrary, but is somehow intrinsic to the entire product consisting of this manufacturer's brand and his rival's brands, trademark protection will be denied." *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 339 (7th Cir.1985).

Therefore, the first issue is whether the oval head is functional as a matter of law or whether there are fact questions to be presented to a jury. If the court finds that the oval head is functional as a matter of law, T & B is not entitled to protection under the Lanham Act. Panduit raises several arguments as to the functionality of the oval shaped head of T & B's TY–RAP. First, Panduit argues that because the shape is contained within the patent it is deemed functional. Second, Panduit asserts that it will not be able to compete effectively without the oval head because there are a limited number of alternative designs available. Finally, Panduit argues that T & B's own advertising touting the utilitarian benefits of the oval shape deems it functional. The Court will discuss each of Panduit's arguments in turn.

### 1. Schwester Patent

[14, 15] The fact that a claimed shape is depicted or claimed in a patent is only evidence of functionality and does not conclusively establish whether the shape is in fact functional. Not every configuration disclosed in a utility patent is automatically classified as primarily functional. 1 McCarthy § 7.29 at 7–10 (citing *Best Lock Corp. v. Schlage Lock Co.*, 413 F.2d 1195 (CCPA 1969)). A utility patent must therefore be examined in detail to determine whether the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of the patent. 1 McCarthy § 7.29 at 7–171 (citing *Black & Decker, Inc. v. Hoover Service Center*, 886 F.2d 1285 (Fed.Cir. 1989)).

■ T & B's counsel argues that the examination of the utility patent is a fact question. The Court disagrees. The Supreme Court recently held that the construction of a patent, including the terms of art within its claim, is exclusively within the province of the Court as a matter of law. *Markman v. Westview Instruments, Inc.*, —— U.S. ——, 116 S.Ct. 1384, 1386, 134 L.Ed.2d 577 (1996). The specification section of the patent described the best mode to manufacture the cable tie: "[t]he opposite or head-end portion 24 of the strap 23 terminates in an oval shaped clinching eyelet 26 . . ." (Nancy Clarke Declaration, June 13, 1996, Ex. 12). As discussed earlier, the Court finds that the oval clinching eyelet is part of the patent. The oval eyelet does not appear in the patent incidentally, but rather is primarily functional and became dedicated to the public upon the expiration of the patent.

Also, T & B's use of the oval shape in manufacturing and marketing the TY–RAP is evidence of its functionality. As stated in *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1031 (Fed.Cir.1985), "for purposes of evaluating the existence or impact of product copying, the relevance of patent figures depends on the extent to which their appearance is replicated in the actual marketplace product of the patentee."

The Court finds that the description of the oval clinching eyelet in the specification section of the Schwester patent and the embodiment of the oval shape in T & B's TY–RAP is evidence of its functionality.

### 2. Alternative designs available

Panduit argues that there are a limited number of alternate designs available and if T & B is granted trademark protection in the oval shape of the TY–RAP head Panduit will not be able to "compete effectively". T & B responds by asserting that there are several alternative designs available that will meet the required military specifications and are in fact cheaper to make. The parties disagree as to whether the alternate designs have to actually be on the market or may simply be hypothetical designs.

The issue to be determined is whether equally functional alternatives exist that are as easily and cheaply manufactured. If there are a reasonable number of alternatives, then the grant of an exclusive trade dress right to one of those alternatives will not impair free competition. 1 McCarthy § 7.26[3][e] at 7–133.

■ T & B's expert witness Mr. Lazar testified at length with respect to 15 [1] differently shaped heads illustrated in PX 211, explaining (i) that these alternative designs would use a substantially equal or smaller amount of material than T & B's design; (ii) that the edges need only be rounded, not oval, for comfort and avoidance of sharp corners in molding; and (iii) that the alternatives could be manufactured at equal or less cost than T & B's TY–RAP cable tie. (T & B's Stmts. 79, 80, 83, 84). However, none of

---

1. Panduit argues that there are really only eight different shapes which have been inverted in an attempt to create a greater number of alternative designs. The Court does not address whether the numerosity of alternative designs is sufficient to establish non-functionality because the alternative designs produced by T & B do not rise to the level of alternate designs that will allow Panduit to effectively compete. However, if it is shown that alternate design do exist which will allow a competitor to effectively compete, then the numerosity of such designs is probative of functionality.

these designs have ever been successfully marketed.

■ In order to determine whether one could effectively compete there must be some evidence that an alternative design would allow the competitor to enter the market and sell the cable ties with the alternate designs. The alternate design submitted by T & B were merely hypothetical designs with no track record of commercial production or marketing.[2] In order to maintain freedom of competition the courts need to ensure that competition will not be stifled by the exhaustion of a limited number of product configurations. *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775, 112 S.Ct. 2753, 2760–61, 120 L.Ed.2d 615 (1992). To this end there must be some evidence that an alternate design could compete effectively before a product configuration can receive trademark protection.

Therefore, because the alternative designs presented were mere hypotheticals that have never been successfully marketed the Court finds that as a matter of law, the oval headed design is necessary to allow Panduit to effectively compete.

### 3. T & B's Advertising

T & B's own statements and promotional materials proclaiming the utilitarian superiority of their product configuration further support the functionality of the oval shape. T & B has heavily promoted and advertised each of the utilitarian benefits of the round-headed, two-piece cable tie design. (Tr. 66–68, 141–44, 157–61; Exs. P–192, D–77, D–105). T & B's merchandise rack includes a sign with an enlarged picture of TY–RAP's head next to which large letters proclaim "The Grip of Steel". Underneath, in smaller type, three bullets all draw attention to the functional advantages of the product: "Proprietary stainless steel barb molded into head giving superior strength and durability;

Low profile head—won't snag looks good; Smooth body prevents breakage problems." (P.Ex. 19). T & B has also testified that the oval head provides other advantages including to (1) help the flow of plastic; (2) reduce costs by using less material; (3) eliminate corners which may cause tooling to "fatigue and fail", and (4) create basically uniform cross sections which gives strength. (Nancy Clarke Declaration, June 13, 1996, Ex. 12; Peter Wells 6/9/94 Tr. at 64–65, 70–71; Martin Tr. at 53). T & B has failed to bring forth evidence showing that T & B ever advertised the oval head as a source identifier rather than as a utilitarian aspect of the cable tie. Also, T & B has not produced evidence to counter all the utilitarian claims of the oval head.

■ The Court holds that the oval shape of the T & B TY–RAP head is functional as a matter of law. The fact that the oval shape is mentioned in the claim section of the patent, that no evidence that alternative designs could effectively compete in the cable tie market, and that T & B's advertising touted the oval shaped head as a utilitarian aspect rather than as a source identifier indicate that the oval shape head is functional and not entitled to trademark protection under the Lanham Act.

### D. SECONDARY MEANING

Even though the Court finds that the oval head is functional, the Court will assume *arguendo* that the oval shape of the head is non-functional and will address the standard test for trade dress infringement.

■ To prevail on a claim of trademark or trade dress infringement, T & B must establish either that its mark or dress has acquired secondary meaning or that its mark or dress is inherently distinctive.[3] *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615

---

**2.** The Court notes that T & B submitted the declaration of Peter Wells with an exhibit showing that one of the alternate designs could be produced. However, the mere production of an alternate design does not show that Panduit would be able to effectively compete in a market where all the cable ties in production have either an oval or rectangular head.

**3.** The parties do not dispute that the oval shape head is not inherently distinctive and the Court will focus on whether the oval head has acquired secondary meaning.

(1992). T & B must also establish "that consumers will be 'likely confused' as to the source of the product because of the similarity of the products' appearance" (*Schwinn*, 870 F.2d at 1182).

"[I]n order to establish that its product feature possesses secondary meaning, T & B must prove that in the minds of consumers the primary significance of the oval head is to identify the TY–RAP as a T & B product." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 661 (7th Cir.1995). In determining whether T & B's trade dress has acquired secondary meaning the Court will consider the following factors: 1) T & B's advertising; 2) T & B's customer surveys; 3) direct consumer testimony; and 4) Panduit's copying.

### 1. T & B's Advertising

■ T & B's advertising describes the utilitarian aspects of the oval head and does not encourage consumers to identify the oval head with T & B. T & B's counsel argues that there are only a few pieces of advertising which claim the utilitarian functions of the oval head. However, the relevant inquiry is not the number of advertisements but rather whether there is any advertising which encourage consumers to identify the oval head with T & B.

As the Seventh Circuit noted, "[a]dvertising a product feature as a source identifier was not unknown to T & B. In an earlier advertising campaign for a different product, T & B called attention to the product's striped tail as a way to identify the source, using the phrase 'look for the tiger stripes on the tail' in its advertising." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 n. 9 (7th Cir.1995). Also, T & B's own product manager, Peter Wells, testified that to his knowledge the oval head shape was never advertised as a way to identify T & B TY–RAPs. (Nancy Clarke Declaration, June 13, 1996, Ex. 13 p. 149).

The Court was not presented with any evidence of advertising that would refute the testimony of Peter Wells or raise a question of fact with respect to T & B advertising only the utilitarian aspects of the oval head. Again as the Seventh Circuit noted "[a]dvertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding. It supports instead the inference that consumers consider the claimed trade dress a desirable feature of the product and not primarily a signifier of source." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir.1995). Thus, T & B's advertising creates an inference against secondary meaning.

### 2. T & B's Customer Surveys

■ T & B commissioned two surveys, one in 1994 and one in 1996, to establish secondary meaning and likelihood of confusion. The following uncontested facts, regarding the 1994 survey, are adopted from the Seventh Circuit's opinion. "Posing as customers, the interviewers visited 154 electric supply retailers in 15 cities and asked the salespeople if they could identify the brand of a cable tie. Each salesperson was shown one of five different cable ties: 1) a T & B TY–RAP, 2) a T & B TY–RAP with the T & B logo removed, 3) a Panduit BARB–TY, 4) a Panduit BARB–TY with the Panduit logo removed, and 5) a one-piece cable tie manufactured by a company named GB." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir.1995).

Part one of the 1996 survey "which complements the first survey was designed to test the source-identifying quality of the oval head shape. To do so, an essentially rectangular headed, barbed cable tie was prepared, and it was shown to interviewees together with the T & B oval headed, barbed cable tie. The rectangular headed cable tie was identical to the T & B oval headed tie except for the shape of the head." (T & B's Opposition Brief p. 23).

Part two of the 1996 survey "consisted of a series of questions to determine whether or not the head shape is considered primarily as an indicator of source, rather than for some other reason, such as any utilitarian aspects it might possess." *Id.* at 24. The purpose of the 1996 survey was to determine whether there was secondary meaning in the oval

head apart from the product itself and that the primary significance of the oval head is to identify T & B's cable tie as a T & B product.

The Seventh Circuit held that the 1994 survey was flawed because the survey "did not separate the allegedly protectable trade dress, the oval head, from the clearly non-protectable elements, the metal barb and slot" and could not show secondary meaning. *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir.1995). As a result the 1996 survey was commissioned. For purposes of this motion the Court will consider both surveys to decide whether the oval shaped head has acquired secondary meaning.

Panduit raises several arguments to explain why the surveys do not establish secondary meaning. The first is that the surveys are flawed because the interviewees were not consumers, but were "salespeople in electrical supply retailers." (Pl.Ex. 32–A at 3). Second, Panduit claims that the survey could be biased because the report does not indicate whether the stores where the majority of the interviewees work only sell T & B ties. If the stores only carried T & B products the interviewees would be more apt to say the tie presented was a T & B product. Finally, Panduit argues that even if the survey was reliable secondary meaning would not be established because only 5% of the interviewees responded that the oval shaped head is important to identify the source of the cable tie.

The 1994 survey and part one of the 1996 survey were flawed because the interviewees were not consumers. The Seventh Circuit held that:

"The issue is not the primary meaning to *consumers* of a particular signifier, but is instead whether a product feature's primary significance to *consumers* is as an identifier of source or as an element which contributes to the inherent appeal of the product." In addition, "*[c]onsumers* must also care that the product comes from a particular producer (though they need not be able to identify him) and must desire the product with the particular feature because it signifies that producer." (Emphasis added).

*Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 658–9 (7th Cir.1995).

The report prepared by RL Associates states that the interviewees were store personnel in electrical supply stores. (Pl.Ex. 32–A p. 3). However, the instructions for the survey stated that the respondents should be "[p]eople who actively work as electricians, or otherwise directly installing cables (e.g. telephone repair people)." *Id.* at App. B Interviewer Instructions. The relevant inquiry in determining secondary meaning must be made of consumers. The 1994 survey and part one of the 1996 survey neither establish that there is secondary meaning in the oval head nor raise an issue of material fact.

Part two of the survey does not establish secondary meaning in the oval head. Part two was directed at determining the primary significance of the shape of the head. The survey established that 30%[4] of the respondents associated recognition with the oval shape versus 10% of the respondents which viewed the shape of the head as important for reasons other than identifying the manufacturer. Notwithstanding the fact that the survey is flawed, 30% recognition is insufficient to establish secondary meaning.

In *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387 (7th Cir.1992), plaintiff conducted a telephone survey and found that 38% of the people interviewed recognized the trademark in question. The court found that a 38% recognition figure was insufficient to establish secondary meaning. "While a 50% figure is regarded as clearly sufficient to establish secondary meaning, a figure in the thirties can only be considered marginal." *Id.* at 394.

Given that the survey did not interview consumers and only produced a 30% recognition factor the court finds that T & B has failed to show that a reasonable jury could find that the oval shape of the head had

---

**4.** Panduit argues that only 5% of the respondents identified the shape of the head as important in identifying the manufacture. However, the court must view the evidence in the light most favorable to T & B and will use the figures provided by T & B.

acquired secondary meaning based on the customer surveys.

### 3. Consumer Testimony

■ T & B submitted deposition testimony and various declarations from electrical distributors and consultants as direct evidence of secondary meaning. Panduit argues that the evidence presented is insufficient to show secondary meaning because 1) the declarants are not consumers, and 2) the testimony does not satisfy the primary significance standard for secondary meaning.

Four distributors and two consultants, all of whom have considerable experience in the electrical industry, state unequivocally in their declarations that they recognize and associate the oval shape of T & B's two-piece, barbed cable tie with T & B and can identify products as T & B products by that oval shape. (Edgar Decl.; Vinar Decl.; Larson Decl.; York Decl.; Keating Decl.; Andrews Dep. P. 16).

Panduit asserts that the above mentioned testimony is not probative because the declarants are not consumers. In *Sassafras Enters. v. Roshco, Inc.*, 915 F.Supp. 1 (N.D.Ill.1996), the court granted summary judgment for defendant in a trade dress case, finding no reasonable jury could find that the alleged trade dress had acquired secondary meaning. The Plaintiff submitted an affidavit of an owner of a sales representative company in support of its allegation of secondary meaning. The court rejected the affidavit because the owner was not deemed a consumer.

However, the court went on to say that "if the relevant buyer class consists of both dealers and ultimate consumers, then the state of mind of the dealers is obviously important." *Id.* at 7. In ¶ 7 of their Complaint Panduit states that they sell their products primarily through distribution. Therefore, the Court will consider the testimony of the declarants as they are part of the buying class.

The testimony of the declarants does not establish a fact question regarding secondary meaning. All of the declarants testified that they recognized and associated the oval head with T & B and that the oval head did not serve any utilitarian purpose. (Edgar Decl.; Vinar Decl.; Larson Decl.; York Decl.; Keating Decl.; Andrews Dep. P. 16). However, under the primary significance standard the declarants must care that the product comes from T & B. Nowhere in the declarations is it stated that the distributors care whether they receive a T & B tie or a Panduit tie.

E. LeRoy Larson comes close to achieving the primary significance standard by stating that "[w]hen I see that oval shape, I know that the product comes from Thomas & Betts, and I have appreciated that for many years." (Larson Decl. ¶ 3). There are two problems with Mr. Larson's testimony: 1) he is presently a consultant with T & B and the Seventh Circuit has held that testimony of a party's own representative, regarding secondary meaning, should be properly discounted by the district court. *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1023 (7th Cir.1979); and 2) while Mr. Larson appreciates knowing where the product comes from he does not say that he cares whether he receives a Panduit tie or a T & B tie. The testimony presented does not support an inference of secondary meaning because it does not establish that the primary significance of the oval head is to identify the source of the product.

### 4. Panduit's Copying

■ T & B argues that Panduit intentionally copied the entire line of TY–RAP cable ties because of the advantages the products enjoyed. "Copying is only evidence of secondary meaning if [Panduit's] intent in copying is to confuse consumers and pass off [its] product as [T & B's]." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir.1995). "[T]he copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source." *Duraco Prods. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1453 (3d Cir. 1994).

T & B relies on the testimony of Donald Henderson, Panduit's former president, as evidence indicating that Panduit intentionally copied T & B's product to cash in on T & B's good will. Mr. Henderson testified that:

From a functional standpoint, to my knowledge as a bystander, the attempt was to make an equivalent product. Then the question comes what do you do with the non-functional parts of the design, and it was decided that a similar appearance, to my knowledge, would reduce the barrier to the sale of the product.

(Henderson Dep. p. 240–241).

Panduit was free to copy T & B's products and the only obligation Panduit had was to "identify its own product lest it be mistaken for that of the plaintiff." *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 119, 59 S.Ct. 109, 114, 83 L.Ed. 73 (1938). It is undisputed that Panduit's name appears on each of its two-piece cable ties, and on its distinctive point of sale packages, which include Panduit's green corporate color, and a bright yellow, black and red "New Entry" sticker displayed on the package that reads: "Using a nylon tie with a metal barb? Try the superior one ... BARB–TY from Panduit." (Exhs. D–75, DP–24, D–75(A)). T & B has not presented any evidence to show that Panduit intended to pass off their BARB–TY as T & B's TY–RAP, rather T & B has merely established that Panduit noticed that consumers liked the oval head metal barb tie and decided to jump on the bandwagon. As the Seventh Circuit stated in *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1363 (7th Cir.1995), "[w]e call that competition, not bad faith, provided there is no intention to confuse, and so far as it appears, there was none." There is absolutely nothing to suggest any intent to confuse customers as to the source of the product, and T & B has not raised any facts which could raise such an inference. Panduit has taken numerous specific steps to identify its BARB–TY as a Panduit product and there is nothing for a jury to consider on this issue.

## E. LIKELIHOOD OF CONFUSION

 Even though T & B has failed to establish secondary meaning the Court will nonetheless discuss whether there is a likelihood of confusion among customers. T & B must establish a likelihood of confusion by showing "that consumers will be 'likely confused' as to the source of the product because of the similarity of the products' appearance." (*Schwinn,* 870 F.2d at 1182). T & B argues that consumers will be confused because of the similarity of the BARB–TY to the TY–RAP.

In *Kellogg* the Supreme Court held that there was not a likelihood of confusion even where the product would later be separated from the packaging in which it was initially distributed. The Court stated that "[t]hese cartons are distinctive and bear prominently the Kellogg name. To put upon the individual biscuit some mark which would identify it as the Kellogg product is not commercially possible." 305 U.S. at 121, 59 S.Ct. at 115. The current case represents the ultimate situation in which customers will not be confused. Every Panduit and T & B tie has the corporate name embossed on it. *Kellogg* found there was no likelihood of confusion even where the products were not individually labeled. For this Court to find that products which are individually labeled would cause confusion would fly in the face of established precedent.

T & B points to the declaration of Lloyd Francis, a T & B employee, which states a production engineer presented him with a faulty tie that happened to be a Panduit tie. This does not establish a likelihood of confusion. "The obligation resting upon [Panduit] is not to insure that every purchaser will know it to be the maker but to use every reasonable means to prevent confusion." *Id.* at 121, 59 S.Ct. at 115. This Panduit has done. Not only has Panduit gone to great lengths to distinguish its product through labeling and packaging, but has also individual marked each tie with its corporate name. It is not the province of this Court to make sure that every purchaser be alerted to the corporate name on each tie before they decide to purchase it. If the consumer does not take the time to notice where the tie is coming from perhaps they simply want a metal barb cable tie and could care less who makes it. There simply is no evidence of passing off or deception on the part of Panduit, and it has taken every reasonable precaution to prevent confusion or the practice of deception in the sale of its product.

Therefore, the Court finds that there is no fact issue on the likelihood of confusion.

### F. USE OF BARB–TY TRADEMARK

■ In Count II, T & B claims that Panduit's use of the term BARB–TY is misleading and likely to cause confusion among consumers because it is a generic term. A generic or common descriptive term can never function as a trademark. *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 935 (7th Cir.1986). On the other hand, a term that is merely descriptive may be used as a trademark if it has acquired secondary meaning. *Id.* Also, the fact that a term is registered is *prima facie* evidence that the term is not generic. 15 U.S.C. § 1115(a).

■ For purposes of this motion, both parties admit that the term BARB–TY is a generic term for a two piece cable tie. However, BARB–TY is a federally registered trademark which raises a presumption against genericness. Based on the incomplete record presented, the Court is unable to decide Count II on the record before it and summary judgment is therefore denied at this time.

### G. STATE LAW CLAIMS

T & B alleges that Panduit's actions also violate several state laws. In Count III, T & B claims that Panduit's conduct violates the common law of unfair competition. In Count IV, T & B alleges that Panduit's conduct violates both the Illinois Consumer Fraud and Deceptive Business Practices Act and the Uniform Deceptive Trade Practices Act. Finally, in Count V, T & B alleges that Panduit's conduct violates the Illinois Anti–Dilution Act. Panduit now moves for summary judgment on all the state law claims.

Panduit argues that all the state law counts are pre-empted if the court finds that the product configuration of the TY–RAP is dedicated to the public upon the expiration of the patent. With respect to Count III, Panduit argues that like Count IV the success of the common law claim is contingent upon a finding that Lanham Act protection is available. Also, Panduit argues and T & B agrees, that Count IV rises and falls on the basis of whether the product configuration is entitled to Lanham Act protection. Finally, Panduit argues that there is no cause of action under Count V because T & B and Panduit are competitors.

### 1. Pre-emption of State Law Claims

■ Upon the expiration of a utility patent the public is free to copy the invention covered by the patent and any state law attempting to hinder that federal right is pre-empted. "One of the fundamental purposes behind the Patent and Copyright Clauses of the Constitution was to promote national uniformity in the realm of intellectual property." *See The Federalist No. 43, p. 309 (B. Wright ed. 1961).*

"A state law that substantially interferes with the enjoyment of an unpatented utilitarian or design conception which has been freely disclosed by its author to the public at large impermissibly contravenes the ultimate goal of public disclosure and use which is the centerpiece of federal patent policy. Moreover, through the creation of patent-like rights, the States could essentially redirect inventive efforts away from the careful criteria of patentability developed by Congress over the last 200 years." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156–7, 109 S.Ct. 971, 980, 103 L.Ed.2d 118 (1989).

■ T & B's state law claims seek protection for an article that was the subject of an expired utility patent. However, the Supreme Court has made it clear, "that state regulation of intellectual property must yield to the extent it clashes with the balance struck by Congress in our patent laws." 489 U.S. at 152, 109 S.Ct. at 978. Also, "the States may not render the exchange fruitless by offering patent-like protection to the subject matter of the expired patent." *Id.*

Therefore, the Court finds that T & B's state law claims conflict with federal patent law and are invalid under the Supremacy Clause of the United States Constitution.

### 2. Common Law of Unfair Competition Under Count III

Even though the state law claims have been found to impermissibly conflict with the

federal patent laws, the Court will discuss each state law claim.

■ T & B's claim of unfair competition fails because there is no finding of protectible trade dress under the Lanham Act. *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir.1983). In order for there to be a violation of unfair competition there must be some protectible claim under the Lanham Act. Since the Court has found that T & B does not have a protectible interest and T & B has not raised an issue of fact with respect to secondary meaning and likelihood of confusion summary judgment for Panduit as to this claim is appropriate.

### 3. Count IV

■ The parties agree that the success of Count IV depends upon the courts determination of the federal trade dress claims. Summary judgment for Panduit is granted as to Count IV because absent protectible trade dress under federal law, claims for violations under the Illinois Consumer Fraud and Deceptive Trade Practices Act and Uniform Deceptive Trade Practices Act are unavailable. *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir.1983); *Sassafras Enter. Inc. v. Roshco, Inc.*, 915 F.Supp. 1, 11 (N.D.Ill.1996).

### 4. Illinois Anti–Dilution Act

■ The Illinois Anti–Dilution act does not apply to competitors. *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.*, 746 F.2d 375, 380 (7th Cir.1984). T & B and Panduit are direct competitors in the sale and manufacture of electrical products, including two-piece self-locking cable ties. (Comp. ¶¶ 6 & 7). Therefore, because T & B and Panduit are competitors summary judgment is granted in favor of Panduit as to Count V.

### V. CONCLUSION

For the foregoing reasons, **Panduit's motion for summary judgment is hereby GRANTED on Counts I, III, IV and V of** plaintiff's complaint and DENIED as to Count II.

**SO ORDERED.**